JOURNAL ENTRY AND OPINION
{¶ 1} Joseph Usaj appeals from an order granting summary judgment in favor of his former employer on claims of breach of contract and constructive discharge. He claims that questions of material fact remain regarding any alleged breach of his employment agreement and his termination. We affirm.
 {¶ 2} The record reveals that Joseph Usaj was employed by Marconi Medical Systems ("Marconi") as Vice President of Global Human Resources since 1998. In 2001, Philips Medical Systems, Inc. ("Philips"), a New York company, entered into a stock purchase agreement to purchase Marconi. In July 2001, and in an effort to retain certain Marconi executives, Philips and Usaj entered into an employment contract. The terms of the contract stated that Usaj would retain a position as Vice President of Human Resources for a period of two years, and stated in part:
"During the Employment Period, the Executive [Usaj] shall serve as Vice President Human Resources, of the Employer [Philips] or in a similar capacity. The principal place of employment shall be Cleveland, Ohio."
 {¶ 3} The contract contained several additional subsections, which outlined his salary, bonuses, and other benefits. The agreement also addressed possible termination, and stated in pertinent part:
"Amounts Due Upon Termination. In the event that the Executive's employment is terminated by Philips during the Employment Period other than for Cause, Philips shall pay Executive a cash lump sum within 60 days of termination equal to the base salary for the remaining portion of the Employment Period, but not less than twelve months' of Executives (sic) base salary as in effect on the date of Executive's termination. In addition, for the year in which Executive's termination for a reason other than Cause occurs, the Executive shall receive amounts payable pursuant to Section 6 hereof and Executive shall be paid a pro rata portion of his or her annual bonus. The Executive shall not be entitled to receive severance pursuant to any other severance plan maintained by Philips if he or she receives the payments above. The payments described in this paragraph shall not be made in the event the executive voluntarily terminates his or her employment with Philips, and shall be paid in lieu of any other payments and benefits under this agreement."
 {¶ 4} When the stock purchase agreement was finalized in October 2001, the employment agreement, and all of its provisions, also went into effect.
 {¶ 5} For the months following Philips' acquisition of Marconi, Usaj remained employed as Vice President of Human Resources, and in February 2002, he was offered two positions: one, a similar Vice President position at the company's location in Seattle, Washington, which he declined, and a second position entitled, "Vice President — North American Human Resources Integration." Although Philips originally labeled this position as "Special Projects," Usaj requested, and Philips accommodated, a renaming of the position to signify Vice President status. Usaj continued in this Integration role until July 2002, when he advised Philips via email that he was "leaving" the company. The email stated:
"I regret to inform you that I will be leaving Philips Medical with my last day being August 16, 2002. I do believe that while working on the HRM PMI project I have added significantly to the success of Medical achieving it's [sic] PMI savings goals. I also appreciate all the attempts made to find a "proper" job by Philips. However, since that has not happened, I will be leaving and I ask that my Employment Agreement of July 12, 2001 be satisfied. In order to insure a smooth transition I have allowed for one month so that we can transfer the ownership of the PMI project and Shared Services to someone else."
 {¶ 6} Following his departure, Usaj attempted to enforce the terms of his July 2001 employment agreement and claimed entitlement to severance monies for constructive discharge. Philips refused to honor the terms of the agreement, claiming that Usaj voluntarily terminated his position thereby waiving any rights to further compensation.
 {¶ 7} In December 2002, Usaj filed a complaint in common pleas court alleging breach of express and implied contract and demanding judgment in an "amount exceeding $25,000, plus interest, costs and reasonable attorney fees." Philips moved for summary judgment, and the trial court granted the motion in September 2004. Usaj appeals from this order in two assignments of error which state:
"I. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED TO DEFENDANT-APPELLEE PHILIPS MEDICAL SYSTEMS ON PLAINTIFF-APPELLANT JOSEPH USAJ'S BREACH OF CONTRACT CLAIMS, WHERE THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER PHILIPS BREACHED USAJ'S EMPLOYMENT AGREEMENT, ENTITLING USAJ TO PAYMENTS UNDER THE AGREEMENT.
II. SUMMARY JUDGMENT FOR APPELLEE WAS IMPROPER ON MR. USAJ'S CLAIMS FOR BREACH OF CONTRACT, WHERE GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING MR. USAJ'S TERMINATION, WHICH WAS A CONSTRUCTIVE DISCHARGE, ENTITLING HIM TO PAYMENT ON THE EMPLOYMENT AGREEMENT."
 {¶ 8} We review the grant of summary judgment de novo, applying the same standard of review as that applied by the trial judge. Buyer's First Realty, Inc. v. Cleveland Area Bd. ofRealtors (2000), 139 Ohio App.3d 772, 785, citing Druso v. BankOne of Columbus (1997), 124 Ohio App.3d 125, 131. Under Civ.R. 56, summary judgment shall be entered in favor of a moving party when:
"(1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party * * *." Armstrongv. Best Buy Co., 99 Ohio St.3d 79, 2003-Ohio-2573.
 {¶ 9} "The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." (Citations omitted.) Zivich v. Mentor Soccer Club, Inc.,82 Ohio St.3d 367, 370, 1998-Ohio-389. If the party requesting summary judgment presents evidence showing its entitlement to judgment as a matter of law, the nonmoving party must then present evidence showing a dispute of material fact. Dresher v. Burt, 75 Ohio St.3d 280,293, 1996-Ohio-107.
 {¶ 10} The employment contract at issue specifically states that the agreement is governed by the laws of the State of New York (Employment Agreement at paragraph 14); however, we note that the standard of review for summary judgment in New York is also a de novo review. Taggart v. Time, Inc. (C.A.2, 1991),924 F.2d 43, 45-46.
I. Breach of Contract
 {¶ 11} In Usaj's first assignment of error, he claims the existence of material questions of fact as to whether Philips breached the employment contract by causing a loss of his job duties, failing to give him an annual merit review, failing to offer him comparable work in Cleveland, and in giving him a new title that was merely illusory.
 {¶ 12} Under New York law, to state a claim for breach of employment contract, a plaintiff must allege the essential elements of an employment contract, including: 1) the making of an agreement; 2) due performance by the plaintiff; 3) breach of the agreement by the defendant; and 4) resulting damage to the plaintiff. See, Stratton Group, Ltd. v. Sprayregen (S.D.N.Y. 1978), 458 F.Supp. 1216, 1217.
 {¶ 13} Since both parties admit that an employment contract was made, and likewise agree that Usaj was to occupy a "Vice President of Human Resources" position, the question then remains only whether a breach of this agreement by Philips occurred and whether Usaj suffered any resulting damage from this breach.
 {¶ 14} Usaj claims that shortly after the Marconi/Philips closing, he was stripped of his job duties. He claims that a former subordinate, Anne Granchi, assumed his duties, and thereby effectively became his supervisor. He also contends that his duties so materially changed that he was only actively working for approximately two to three hours a day, with the better part of his prior duties either eliminated or assigned to other employees.
 {¶ 15} The employment agreement, however, does not set forth a job description outlining Usaj's duties and responsibilities, and states only that during the employment period, "the Executive shall serve as Vice President Human Resources, of the Employer or in a similar capacity." Therefore, by the plain language of the document, as long as Usaj retained the title of Vice President Human Resources, or a similar title, there was no breach of the terms of the contract. It is clear from the deposition testimony that Usaj's duties had changed during the transition, but it is equally clear that throughout his tenure with Philips, he retained the position as titled in the employment agreement.
 {¶ 16} While Usaj claims that his new position as Vice President of Integration was merely temporary, i.e., six to nine months after the date it was created, he resigned before any "temporary" time frame had passed, and almost one full year before his employment agreement would have expired. He argues that, when Granchi was promoted to general manager, the position eliminated his job and Granchi "effectively" became his supervisor. (Usaj Deposition at 86.) He stops short, however, of stating that she was in fact his supervisor, or that he had to report to her. He further admits that he began actively seeking outside employment immediately after closing, a time frame before Granchi "effectively" became his supervisor, and also before he was offered either an alternate position in Seattle or Vice President of Integration.
 {¶ 17} Usaj relies on Rudman v. Cowles Communications, Inc.
(1972), 30 N.Y.2d 1, 10, for the proposition that "[i]f an employee, a fortiori an executive employee, is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement." The facts indicate that Rudman brought suit for wrongful discharge when a publishing company that had purchased his company and contracted to employ him, began substantially altering the material that Rudman himself had created. He then discovered that the publishing company had taken over the complete production of the testing manuals that he created. The company also forced him to report to subordinates, and they did not list him as the author of the manuals that he had created. The company then terminated Rudman after he continually protested the changes.
 {¶ 18} Although Rudman was terminated, forced to report to subordinates, and was not given credit for work that he created, there is no indication of a preliminary breach by Rudman or that he sought outside employment while remaining in his contractual position with the publishing company, thereby distinguishing it from the case at hand.
 {¶ 19} Usaj contends that his title of Vice President was merely illusory, but, as previously stated, the employment contract itself is silent as to required job duties or responsibilities. He claims that his job materially changed from its previously global nature to one limited to North American operations; however, the employment agreement guaranteed a position similar to Vice President of Human Resources, not similar to the position that he previously occupied.
 {¶ 20} A final argument that Philips breached the agreement by failing to give Usaj a merit review also lacks merit. He has failed to show how the lack of a merit review, the results of which are merely speculative and tenuous at best, has caused him to suffer damages. To the contrary, he admits that he transferred from Philips to Ferro Corporation without any lapse in pay, thereby negating any damages.
 {¶ 21} For these reasons, we find that this assignment of error lacks merit.
II. Constructive Discharge
 {¶ 22} In Usaj's second assignment of error, he claims that by Philips' breach of the employment agreement, the company constructively discharged him. We disagree.
 {¶ 23} To establish a "constructive discharge," a plaintiff must show that the employer "`deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" Pena v. Brattleboro Retreat
(C.A.2, 1983), 702 F.2d 322, 325, quoting Young v. SouthwesternSavings Loan Assn. (C.A.5, 1975), 509 F.2d 140, 144. A constructive discharge generally cannot be established, however, simply through evidence that an employee was dissatisfied with the nature of his assignments. Stetson v. NYNEX Serv. Co.
(C.A.2, 1993), 995 F.2d 355, 360-361. "To find that an employee's resignation amounted to a constructive discharge, the `trier of fact must be satisfied that the * * * working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"Lopez v. S.B. Thomas, Inc. (C.A.2, 1987), 831 F.2d 1184, 1188, quoting Rosado v. Santiago (C.A.1, 1977), 562 F.2d 114, 119. InWhidbee v. Garzarelli Food Specialities, Inc. (C.A.2, 2000),223 F.3d 62, 73, the court found that constructive discharge occurs if "[w]orking conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id., quoting Chertkova v. Connecticut Gen. Life Ins. (C.A.2, 1996)92 F.3d 81, 89. Constructive discharge also requires deliberate action on the employer's part, and while the meaning of "deliberate" is unsettled, "something beyond mere negligence or ineffectiveness is required." Whidbee v. Garzarelli at 74; see, e.g., Kader v. Paper Software, Inc. (C.A.2d, 1997),111 F.3d 337, 341.
 {¶ 24} In his deposition, Usaj admitted that his alleged constructive discharge caused him no humiliation and no mental or emotional stress. (Usaj Deposition at 11-13.) He even stated during his deposition that while he felt his new title as Vice President of North American Human Resources Integration was not of "similar capacity," he did not express any dissatisfaction with the job during his tenure. (Usaj Deposition at 269-270.) Therefore, he has failed to establish that he was subjected to working conditions which were so intolerable and unpleasant as to compel a reasonable person in his position to resign, but rather he repeatedly reported Philips' numerous attempts to find him a "proper" job and to accommodate him.
 {¶ 25} The record reflects that Usaj admittedly began searching for other employment in October 2001, or shortly after the Marconi/Philips closing. (Usaj deposition at 86.) It also reflects that Usaj specifically pursued employment with Ferro Corporation from February 2002 through July 2002. In 2002, he interviewed with Ferro in March, April, June, and July. Usaj was ultimately offered a Vice President of Human Resources position at Ferro Corporation with a significant pay increase three days before notifying Philips of his intention to leave.
 {¶ 26} New York courts have looked unfavorably on individuals claiming constructive discharge when they were already interviewing for a new position. See, Kripke v. BenedictineHospital (1996), 169 Misc.2d 98, 104, 641 N.Y.S.2d 996. "At least one Federal court has expressed an unwillingness to find constructive discharge when an employee chooses to stay at one job while looking for another." Id., citing Wagner v. SandersAssn. (C.D.Cal. 1986), 638 F.Supp. 742, 746.
 {¶ 27} For these reasons, we find that Usaj has failed to prove that he was constructively discharged.
 {¶ 28} Usaj's second assignment of error lacks merit.
 {¶ 29} The ruling of the trial court is affirmed.
It is ordered that appellee shall recover of appellant costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J., And Cooney, J., concur.